Jason R. Flanders (State Bar No. 238007)
Amanda M. Prasuhn (State Bar No. 306718)
AQUA TERRA AERIS LAW GROUP
828 San Pablo Avenue, Suite 115B
Albany, CA 94706
Telephone: (916) 202-3018
Email: jrf@atalawgroup.com

Drevet Hunt (State Bar No. 240487)
Lawyers for Clean Water, Inc.
1004 O'Reilly Avenue, Suite A
San Francisco, California 94121
(415) 813-6686
Email: drev@lawyersforcleanwater.com

*Counsel for Plaintiffs (additional counsel listed on next page)*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ECOLOGICAL RIGHTS FOUNDATION, et al., <br><br> Plaintiff, <br> v. <br> FEDERAL EMERGENCY MANAGEMENT AGENCY, <br><br> Defendant. | Civil Case No. 3:17-cv-02788-JD <br><br> **MOTION FOR SUMMARY JUDGMENT, MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT** <br><br> (*Federal Endangered Species Act, 16 U.S.C. § 1531 et seq.*) <br><br> Hearing Date/Time: TBD <br> Hon. James Donato |

## **TABLE OF CONTENTS**

I.     STATEMENT OF ISSUES TO BE DECIDED ........................................................1

II.    STATUTORY BACKGROUND.............................................................................1

     A.    The Endangered Species Act .................................................................1

     B.    The National Flood Insurance Program .................................................3

III.   STATEMENT OF FACTS .....................................................................................4

IV.   STANDARD OF REVIEW .....................................................................................6

V.    SCOPE OF REVIEW ............................................................................................7

VI.   ARGUMENT .........................................................................................................7

     A.    FEMA'S Discretionary Floodplain Management Activities May Affect ESA Species and Critical Habitat....................................................................9

     B.    FEMA's Discretionary Flood Hazard Mapping Activities May Affect ESA Species and Habitat.............................................................................13

     C.    The Evidence Clearly Demonstrates that Implementation of the NFIP as a Whole Influences Floodplain Development, which May Affect ESA Species and Habitat ...15

     D.    FEMA's Own Evidence Fails to Support its Conclusion that the NFIP does not Influence Floodplain Development..............................................................18

VII.  PLAINTIFFS HAVE STANDING TO MAINTAIN THIS ACTION ...................21

VIII. REMEDIES...........................................................................................................23

IX.   CONCLUSION......................................................................................................24

1

## __TABLE OF AUTHORITIES__

2

<u>**Cases**</u>

3
*Bennett v. Spear,*

4
    *520 U.S. 154, 176 (1997)* ........................................................................22

5
*Biodiversity Legal Fndn. v. Badgley,*

6
    309 F.3d 1166 (9th Cir. 2002) ...............................................................23

7
*Cal. ex rel. Lockyer v. U.S. Dep't of Agric.,*

8
    575 F.3d 999 (2009)...............................................................2, 10, 12

9
*Cantrell v. City of Long Beach,*

10
    241 F.3d 674 (9th Cir. 2001) ...............................................................22

11
*Celotex Corp. v. Catrett,*

12
    477 U.S. 317 (1986)..............................................................................6

13
*City of Sausalito v. O'Neill,*

14
    386 F.3d 1186 (9th Cir. 2004) ...............................................................22

15
*Cnty. of Los Angeles v. Shalala,*

16
    192 F.3d 1005 (D.C. Cir. 1999)...........................................................6, 7

17
*Coal. for Sustainable Delta v. Fed. Emergency Mgmt. Agency,*

18
    812 F.Supp.2d 1089 (E.D. Cal. 2011)..............................................2, 17

19
*Defs. of Wildlife v. United States EPA,*

20
    420 F.3d 946 (9th Cir. 2005) ...............................................................20

21
*Ecological Rights Found. v. Pac. Lumber Co.,*

22
    230 F.3d 1141 (9th Cir. 2000) ...............................................................22

23
*Ellis v. Housenger,*

24
    No. C-13-1266 MMC, 2015 U.S. Dist. LEXIS 76536 (N.D. Cal. 2015) ................................7

25
*Florida Key Deer v. Paulison,*

26
    522 F.3d 1133 (11th Cir. 2008) ....................................2, 9, 10, 12, 17

27
*Friends of the Earth, Inc. v. Laidlaw Environmental Servs. (TOC), Inc.,*

28
    528 U.S. 167 (2000)............................................................21, 22, 23

*Karuk Tribe of Cal. v. U.S. Forest Serv.*,

    681 F.3d 1006 (9th Cir. 2012) ...................................................................................11, 14

*Klamath-Siskiyou Wildlands Ctr. V. Nat'l Oceanic & Atmospheric Admin. Nat'l Marine Fisheries Serv.*,

    109 F.Supp.3d 1238 (N.D. Cal. 2015) .......................................................................23

*Lujan v. Defenders of Wildlife*,

    504 U.S. 555 (1992)..............................................................................................21, 22

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*,

    463 U.S. 29, 43 (1983)..............................................................................................6, 7

*Natural Resources Defense Counsel v. EPA*,

    542 F.3d 1235 (9th Cir. 2008) ....................................................................................22

*Natural Res. Def. Council v. Houston*,

    146 F.3d 1118 (9th Cir. 1998) ......................................................................................2

*NRDC, Inc. v. Pritzker*,

    828 F.3d 1125 (9th Cir. 2016) ................................................................7, 11, 13, 14

*NWF v. FEMA*,

    345 F.Supp.2d 1151 (W.D. Wash. 2004)........................................2, 8, 10, 15, 17

*Pacific Northwest Generating Cooperative v. Brown*,

    38 F.3d 1058 (9th 1994)........................................................................................22, 23

*Pacificans for a Scenic Coast v. Cal. DOT*,

    2016 U.S. Dist. LEXIS 55672 (N.D. Cal. 2016) .......................................................7

*Salmon Spawning & Recovery Alliance v. Gutierrez*,

    545 F.3d 1220 (9th Cir. 2008) ....................................................................................22

*South Dakota v. Dole*,

    483 U.S. 203 (1987).....................................................................................................18

*S.W. Ctr. for Biological Diversity v. U.S. Forest Serv.*,

    100 F.3d 1443 (9th Cir. 1996) ...................................................................2, 7, 12, 21

*The Lands Council v. McNair*,

    537 F.3d 981 (9th Cir. 2008) ...................................................................................6, 21

*Turner Broadcasting Sys. v. Fed. Communications Commission*,

    520 U.S. 180 (1997)...................................................................................................16

*TVA v. Hill*,

    437 U.S. 153 (1978).................................................................................................23

*Wash. Toxics Coal. v. EPA*,

    413 F.3d 1024 (9th Cir. 2005) .................................................................................23

*W. Watersheds Project v. Kraayenbrink*,

    632 F.3d 472 (9th Cir. 2011) ...................................................6, 7, 11, 13, 14, 21

**Statutes**

5 U.S.C. § 706.................................................................................................................6

5 U.S.C. § 706(2)(A)..............................................................................................7, 8, 23

5 U.S.C. § 706(2)(D)......................................................................................................8

16 U.S.C. § 1531...........................................................................................................1

16 U.S.C. § 1536(a)(2)..................................................................................................1

42 U.S.C. § 4001(c)(1)..................................................................................................16

42 U.S.C. § 4001(e) ..................................................................................................9, 16

42 U.S.C. § 4002(a)(1)....................................................................................................9

42 U.S.C. § 4002(a)(2)..................................................................................................16

42 U.S.C. § 4012a....................................................................................................3, 18

42 U.S.C. § 4012(b)(1)(A).............................................................................................19

42 U.S.C. § 4022............................................................................................................9

42 U.S.C. § 4101.......................................................................................................3, 13

42 U.S.C. § 4101(e)........................................................................................................3

42 U.S.C. § 4101(e)-(f)(1).............................................................................................13

42 U.S.C. § 4102(c)......................................................................................................10

42 U.S.C. 4102(c)(2).......................................................................................................3

1   42 U.S.C. § 4106 ...................................................................................................4, 18

2   42 U.S.C. § 4202 ...................................................................................................4, 18

3   **Administrative Regulations**

4   44 C.F.R. § 59.2(a) ......................................................................................................3

5   44 C.F.R. § 59.22 ........................................................................................................3

6   44 C.F.R. § 59.24 ........................................................................................................3

7   44 C.F.R. § 60.1(b) ...................................................................................................10

8   44 C.F.R. § 60.3 ..........................................................................................................3

9   44 C.F.R. §60.3(a)(2) ................................................................................................13

10   44 C.F.R. § 60.3(d)(3) ..............................................................................................10

11   44 C.F.R. § 60.5(b)(2) ..............................................................................................12

12   44 C.F.R. § 60.22(c)(2) ............................................................................................12

13   44 C.F.R. § 64.3 ..........................................................................................................3

14   44 C.F.R. § 65.5 ........................................................................................................15

15   44 C.F.R. § 65.6 ........................................................................................................15

16   44 C.F.R. pt. 72 ........................................................................................................15

17   44 C.F.R. §72.1 .........................................................................................................15

18   44 C.F.R. §72.2 ......................................................................................................3. 15

19   50 C.F.R. § 402.02 .......................................................................................1, 2, 10, 15

20   50 C.F.R. § 402.14(a) .................................................................................................2

21   **Other Authorities**

22   51 Fed. Reg. 19,926, 19,949 .......................................................................................2

23   55 Fed. Reg. 28,291 ...............................................................................................3, 12

24   Fed. R. Civ. Proc. 56 ...................................................................................................1

25   Fed. R. Civ. P. 56(c) ....................................................................................................6

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## NOTICE OF MOTION AND MOTION

For the reasons stated herein, Plaintiffs Ecological Rights Foundation and Humboldt Baykeeper ("Plaintiffs") move for summary judgment that Defendant Federal Emergency Management Agency's ("Defendant" or "FEMA") "Biological Evaluation" ("BE") was arbitrary and capricious in determining that FEMA's implementation of the National Flood Insurance Program ("NFIP") would have "no effect" on threatened and endangered species, and their critical habitat, as protected by the Federal Endangered Species Act ("ESA"). Fed. R. Civ. Proc. 56; 16 U.S.C. § 1531 et seq. Further, Defendant's implementation of the NFIP may affected ESA listed species and habitat, and consultation with federal wildlife agencies is required. Hearing time and date will be set following completion of briefing. Dkt. No 27.

## RELIEF REQUESTED

Plaintiffs request declaratory relief that FEMA's BE "no effect" determination was arbitrary, capricious, and not in accordance with law; declaratory relief that FEMA's NFIP implementation "may affect" ESA protected species and habitat; and injunctive relief setting aside the BE, staying any activities taken in furtherance thereof, and ordering ESA consultation.

## MEMORANDUM

### I.      STATEMENT OF ISSUES TO BE DECIDED

Was FEMA arbitrary and capricious in its BE determination that FEMA's implementation of the NFIP has "no effect" on ESA listed species and their habitat, throughout the United States? In rendering its determination, did FEMA provide a rational explanation based on the evidence, consider the relevant factors, and otherwise comply with the ESA?

Or, is FEMA required to consult with federal wildlife agencies because its implementation of the NFIP "may affect" ESA listed species and their habitat?

### II.      STATUTORY BACKGROUND

### A.  The Endangered Species Act

ESA section 7(a)(2) requires, among other things, that any Federal agency "action" is not likely to jeopardize the survival of listed species, or destroy or adversely modify a species' designated critical habitat. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.02. The term "'agency action' has been defined

broadly." *Natural Res. Def. Council v. Houston*, 146 F.3d 1118, 1125 (9th Cir. 1998). "Action means all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies . . . ." 50 C.F.R. § 402.02.

A federal agency must initiate consultation with the National Marine Fisheries Service ("NMFS")(for marine or anadromous species) or the Fish and Wildlife Service ("FWS")(for all other species) whenever it takes an action that "may affect" a species listed as threatened or endangered, or designated critical habitat, under the ESA. 50 C.F.R. § 402.14(a). The "may affect" threshold is a very low bar. *See Cal. ex rel. Lockyer v. U.S. Dep't of Agric.*, 575 F.3d 999, 1018-19 (2009)(citing 51 Fed. Reg. 19,926, 19,949 (June 3, 1996)["Any possible effect, whether beneficial, benign, adverse or of an undetermined character, triggers the formal consultation requirement "]). ESA regulations define "effects of the action" to include both "direct and indirect effects of an action on the species or critical habitat" (50 C.F.R. § 402.02), and further define indirect effects as those that are "caused by the Proposed Action and are later in time, but are still reasonably certain to occur" (50 C.F.R. § 402.02). Where an action will not affect the listed species at all, the consultation duty is not immediately triggered: "The Federal agency makes the final decision on whether consultation is required, and it likewise bears the risk of an erroneous decision." 51 Fed. Reg. 19926, 19949 (June 3, 1986); *see also S.W. Ctr. for Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1447-48 (9th Cir. 1996). For example, every court to consider the issue has rejected FEMA's claims that the NFIP has no effect upon ESA species or habitat. *See Florida Key Deer v. Paulison*, 522 F.3d 1133, 1143 (11th Cir., 2008)("FEMA and the FWS alternatively argue that . . . the issuance of flood insurance is not a legally relevant 'cause' of the development in the Florida Keys that threatens the listed species. We are not persuaded"); *Nat'l Wildlife Fed'n v. Fed. Emergency Mgmt. Agency*, 345 F. Supp. 2d 1151, 1164, 1169, 1176-77 (W.D. Wash. 2004)(components of NFIP may affect listed species requiring ESA consultation); *Coalition for a Sustainable Delta v. Fed. Emergency Mgmt. Agency*, 812 F.Supp.2d 1089, 1132-33 (E.D. Cal 2011)(rejecting FEMA "no effect" argument: "FEMA retains authority to modify how and under what circumstances it will consider allowing floodplain modifications in its mapping activities. This 'discretionary' action 'directly or indirectly causes modifications to the land and water'").

**B. <u>The National Flood Insurance Program</u>**

The NFIP, administered by FEMA, is designed to provide property owners with an insurance alternative to escalating disaster repair costs, where private flood insurance is generally unavailable in flood prone areas. 44 C.F.R. § 59.2(a). Under the NFIP, local communities become eligible for federal flood insurance once they adopt "adequate land use and control measures" consistent with criteria developed by FEMA to "improve the long range land management and use of flood-prone areas." 42 U.S.C. § 4102(c)(2); 44 C.F.R. § 59.22 (prerequisites for the sale of flood insurance); 44 C.F.R. § 60.3 ("comprehensive criteria"). A community's failure to implement and enforce NFIP minimums can result in probation or suspension from the program, making federal flood insurance unavailable. 44 C.F.R. § 59.24. FEMA also implements a Community Rating System ("CRS"), a separate, voluntary program to encourage local floodplain management regulation that exceeds the regulatory minimums, and is rewarded with lower insurance rates. *See* 55 Fed. Reg. 28,291 (July 10, 1990).

FEMA further implements the NFIP by developing maps and other information that identify flood-prone areas. 42 U.S.C. § 4101. These Flood Insurance Rate Maps ("FIRM"s) identify various categories of flood hazard areas in which land use criteria are to apply. *See* 44 C.F.R. § 64.3 (identifying different zones on FIRMs). FEMA must review the maps every five years to accommodate new information. 42 U.S.C. § 4101(e). If individuals can show an inaccuracy or change in the map that affects the status of their property, FEMA can grant a Letter of Map Change ("LOMC") that revises or amends the flood hazard information shown on the FIRM without requiring the FIRM to be physically revised and re-published. Declaration of Drevet Hunt (hereafter "Hunt Dec.") Ex. B; FEMA-BE-0027688-89. FEMA can issue a range of different types of LOMCs depending on circumstances, and may in its discretion attach conditions to them. *See* 44 C.F.R. § 72.2.

Community participation in the NFIP is technically voluntary, but virtually all communities in the United States participate in the NFIP. *See* FEMA-BE-0027706. Failure to enroll in the NFIP significantly affects property owners in the community's floodplains, including the availability of federal financial assistance. For example, mortgages from a federally insured or regulated bank and Veterans Administration loans are prohibited if the building used to secure the assistance is in the 100-year floodplain and lacks flood insurance. 42 U.S.C. § 4012a. The law also prohibits federal agencies

such as the Federal Housing Administration and the Small Business Administration from making or guaranteeing a loan secured by a building in a floodplain unless flood insurance has been purchased, but federal flood insurance cannot be purchased for buildings in non-participating communities. *Id.* §§ 4202, 4106.

### III.   STATEMENT OF FACTS

In November 2016, FEMA adopted the BE to assess its compliance with the ESA. The "Proposed Action" evaluated by the BE "is the current implementation of the NFIP, as modified by recent legislation and other proposed program changes." FEMA-BE-0027656. The BE divides FEMA's NFIP implementation into categories of "Floodplain Management," "Flood Hazard Mapping," and "Flood Insurance," and acknowledges that FEMA exercises discretion in how it implements the NFIP within each of these categories. FEMA-BE-0027663-65. However, the BE concludes that "[t]he Proposed Action does not cause development to occur, nor does it play a significant role in facilitating or encouraging floodplain development." FEMA-BE-0027740. The BE contends that FEMA's NFIP implementation has "no effect" upon any ESA protected species or designated critical habitat, throughout the U.S. FEMA-BE-0027663.

The BE admits that floodplain development has extensive adverse impacts to species: "Habitat loss, fragmentation, degradation, and disturbance are the result of incremental conversion of natural lands to agricultural, residential, commercial, or industrial uses, including mineral extraction. In addition to direct habitat loss within the construction footprint, degradation to surrounding natural lands may occur from erosion or through the introduction of non-native plants and animals, including domestic animals. Habitat fragmentation increases the amount of edge habitat and decreases the amount of core or interior habitats. The edge habitats produced by fragmentation from development often lack the transition zones found in natural habitat edges, reducing overall habitat functionality [citation] and can increase predation and the risk of parasitism by other species [citation]." FEMA-BE-0027714.

"Changes to water quality in nearby bodies of water often occur as a result of development. These changes include increases in turbidity from erosion; increases in water temperature from removal of overhanging vegetation; and pollution in the form of non-point source runoff of contaminants from roadways, parking lots, and lawns and point source contaminants from wastewater treatment plants and industrial activities [citation]. Contaminants include pesticides, metals, petroleum products, pharmaceuticals, and household soap/detergent products. In terms of ESA-listed species and designated critical habitats, water quality degradation provides the greatest threat resulting from pollution." FEMA-BE-0027714–15.

> "Development may also cause changes to hydrology, erosion, and sediment transport. For instance, channelization of waterways and installation of hardened banks can alter flows, direct flood energy to other areas, and affect sediment transport; the resulting changes in substrates, flow rates, and depths may alter aquatic habitats [citation]." FEMA-BE-0027715.

FEMA's BE selected representative ESA protected species for further evaluation. FEMA identified for study fifty mammal species listed as endangered, and thirteen mammal species listed as threatened, which includes twenty-six areas of designated critical habitat. FEMA-BE-0027757, 0027761–63, 0027765. These include mammal species residing in wetlands, beaches, barren lands, rangelands, and forests. *Id.* The BE found, among other things, that:

> "Habitat destruction or disturbance from commercial, residential, and recreational development of beaches and coastal areas" and predation exacerbated by nearby human developments are "threats to beach mammals." FEMA-0027761.

> "Loss and fragmentation of habitat due to agriculture, industrial development, urban development, recreation, and other human development activities," predation exacerbated by nearby human developments, and pesticides and other agricultural pollutants are "threats to rangeland mammals." FEMA-BE-0027763–64.

FEMA identified for study seventy-one bird species listed as endangered, thirteen as threatened, and two listed as endangered in some states and threatened in others, which includes twenty-four species with designated critical habitat. FEMA-BE-0027771, 0027773–81. These include bird species residing in forested wetlands, non-forested wetlands, freshwater, nearshore marine environments, rangelands, and forest lands. *Id.* The BE found, for example, that:

> "Loss, modification, and fragmentation of habitat due to dams, timber harvesting, urban development, agriculture, and other human development activities" are "threats to wetland bird species." FEMA-BE-0027771, 73.

> Loss of habitat due to development, human disturbances, pollution from spills and runoff, and predation exacerbated by nearby human development are "threats to freshwater birds." FEMA-BE-0027774-75.

FEMA identified eighty-six fish species listed as endangered, and forty-eight listed as threatened, which includes eighty species with designated physical habitat. FEMA-BE-0027799-03. The BE found, among other things: that fragmentation of habitat due to dams and diversions, erosion and sedimentation due to development, and pollution are threats to freshwater resident fish species (FEMA-BE-0027799); loss of habitat from development and pollution are threats to nearshore marine fish (FEMA-BE-0027800); and

1   that dams and diversions, erosion and sedimentation due to development, water withdrawals, and

2   pollution are threats to anadromous fish (FEMA-BE-0027801–02). These representative impacts are not

3   exclusive, and the BE rendered similar analyses for reptiles, amphibians, invertebrates, and plants,

4   consistently concluding floodplain development adversely affects threatened and endangered species

5   and designated critical habitats. FEMA-BE-0027785-90, 0027793-96, 0027809-12, 0027814-15,

6   0027817, 0027826-32.

7        Accordingly, there can be no reasonable dispute that floodplain development itself may affect

8   ESA listed species and habitat. Indeed, given the magnitude and scope of these impacts, NMFS and

9   FWS have determined on multiple occasions that FEMA's implementation of the NFIP not only "may

10  affect" ESA listed species and critical habitat, but further that this agency action may cause *jeopardy* to

11  the survival of listed species, and adverse modification of critical habitat. *See* FEMA-BE-0031305,

12  0031352-53, 0030394.

13      **IV.    STANDARD OF REVIEW**

14       If "there is no genuine issue as to any material fact and . . . the moving party is entitled to

15  judgment as a matter of law." Fed. R. Civ. Pro. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23

16  (1986). This case presents purely legal questions. The ESA provides a citizen suit right of judicial

17  review, but "[b]ecause ESA contains no internal standard of review, section 706 of the Administrative

18  Procedure Act, 5 U.S.C. § 706, governs review." *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472,

19  496 (9th Cir. 2011)(cites and quotes omitted). Pursuant to this standard, the Ninth Circuit has explained,

20  "[t]o determine whether [an agency's] no effect determination was arbitrary and capricious, [a court]

21  must decide whether the agency 'considered the relevant factors and articulated a rational connection

22  between the facts found and the choice made.'" *Id*. An agency's decision is also arbitrary and capricious

23  if it "entirely failed to consider an important aspect of the problem" or "offered an explanation that runs

24  counter to the evidence before the agency." *The Lands Council v. McNair,* 537 F.3d 981, 987 (9th Cir.

25  2008) (quotes and cites omitted). Moreover, a Court must ensure that the agency has "examined the

26  relevant data and articulated a satisfactory explanation for its action." *Motor Vehicle Mfrs. Ass'n v. State*

27  *Farm Mut. Auto Ins. Co*., 463 U.S. 29, 43 (1983). "Where the agency has failed to provide a reasoned

28  explanation, or where the record belies the agency's conclusion, [the court] must undo its action." *Cnty.*

1  *of Los Angeles v. Shalala*, 192 F.3d 1005, 1021, (D.C. Cir. 1999). Finally, an agency decision should be

2  set aside if "otherwise not in accordance with law." *See* 5 U.S.C. § 706(2)(A). "An agency acts contrary

3  to the law when it gives mere lip service or verbal commendation of a standard but then fails to abide the

4  standard in its reasoning and decision." *NRDC, Inc. v. Pritzker*, 828 F.3d 1125, 1135 (9th Cir. 2016).

5  ### V.   SCOPE OF REVIEW

6  Although governed by the APA standard of review, judicial review for compliance with the ESA

7  is not limited solely to the administrative record: "we may consider evidence outside the administrative

8  record for the limited purposes of reviewing Plaintiffs' ESA claim." *W. Watersheds Project, supra*, 632

9  F.3d at 497 (cites omitted); *see also, Ellis v. Housenger*, No. C-13-1266 MMC, 2015 U.S. Dist. LEXIS

10  76536, at *11 (N.D. Cal. 2015) ("where a claim alleges a failure to consult, in violation of the ESA . . .

11  the court . . . is not limited to a review of the administrative record, as the claim is not governed by the

12  APA"); *Pacificans for a Scenic Coast v. Cal. DOT*, 2016 U.S. Dist. LEXIS 55672 (N.D. Cal.

13  2016)(same).

14  ### VI.   ARGUMENT

15  FEMA's determination that the NFIP has *no effect* on ESA listed species or critical habitat

16  throughout the United States is arbitrary and capricious, not in accordance with law, and should be set

17  aside. Numerous statutes, federal courts, federal agencies, and academic publications—including

18  FEMA's own studies—all have found that implementation of the NFIP influences floodplain

19  development, and may actually encourage such development to occur. FEMA admits, as it must, that

20  floodplain development itself profoundly affects ESA listed species and their designated critical

21  habitats. However, FEMA argues that *its* regulatory activities do not, in turn, affect floodplain

22  development. FEMA's conclusion is clearly arbitrary and capricious, "runs counter to the evidence

23  before the agency, [and] is so implausible that it could not be ascribed to a difference in view or the

24  product of agency expertise." *See Southwest Ctr. For Biological Diversity*, *supra*, 100 F.3d at 1448,

25  *quoting Motor Vehicle Mfrs. Ass'n*, *supra*, 463 U.S. at 43. Indeed, FEMA's determination ignores its

26  own evidence that NFIP implementation "may affect" listed species and habitat. Instead, FEMA fails to

27  consider the required factors and fails to proceed in the manner required by law, basing its conclusions

28  upon an irrelevant higher threshold of whether its actions effectively "will affect" such species and

1   habitat. FEMA's BE and its no effect determination should be set aside.

2       Numerous courts have already found NFIP implementation to require ESA consultation:
3       specific actions by FEMA in implementing NFIP may cause damage to endangered chinook
        salmon by encouraging development and fill in floodplains. FEMA engages in four central
4       activities: (1) mapping; (2) developing minimum eligibility criteria which communities must use
        to develop their flood management regulations in order to be eligible for NFIP; (3) selling flood
5       insurance; and (4) developing a community rating system to provide communities with
        discounted flood insurance premiums if they adopt flood management regulations which exceed
6       FEMA's minimum eligibility criteria. Each of these different activities could potentially cause
        damage to the threatened Puget Sound chinook salmon.
7

8   *Nat'l Wildlife Fed'n*, *supra*, 345 F. Supp. 2d at 1163-64, 1177 ("FEMA has violated Section 7(a)(2) of

9   the ESA by failing to consult with NMFS to ensure that: (1) the regulations establishing the minimum

10  eligibility criteria for the NFIP, (2) the mapping of the floodplains, and revisions thereof, and (3) the

11  CRS [Community Rating System] are not likely to jeopardize the continued existence of the Puget

12  Sound chinook salmon. FEMA's failure to consult with NMFS is 'arbitrary, capricious, an abuse of

13  discretion, or otherwise not in accordance with law,' and 'without observance of procedure required by

14  law.' 5 U.S.C. § 706(2)(A), (D)"). The BE's arbitrary and illegal assessment of these issues is discussed,

15  below.

16       First, FEMA admits that its development and supervision of minimum floodplain development

17  criteria may affect ESA protected species and habitat ("there is strong evidence to suggest that the

18  minimum floodplain criteria act to restrain floodplain development," FEMA-BE-0027879), but FEMA

19  arbitrarily concludes its actions actually have no effect, admitting that its conclusion rests upon the fact

20  that "FEMA has no data or studies to support when and where that floodplain development is being

21  restrained" (*id.*). In addition, FEMA proposes to pass off ESA compliance to participating communities,

22  instead of engaging in federal wildlife agency consultation itself. Thus, FEMA's explanations run

23  counter to the evidence before the agency, are admittedly not based on evidence at all, impose a standard

24  of "will affected" instead of "may affect", and seek to illegally shift FEMA's duties onto participating

25  communities.

26       Second, FEMA admits it exercises discretion in its floodplain mapping activities, and that such

27  activities may affect how and where floodplain development occurs—thereby affecting ESA species and

28  habitat—but disavows any such effect because FEMA again purports to lack evidence showing exactly

1    when and where such effects have occurred. This again fails to employ the correct standard, runs counter

2    to the evidence, and is not based on evidence at all.

3         Third, FEMA arbitrarily determined that implementation of the NFIP, as a whole, does not

4    incentivize or facilitate floodplain development, and that floodplain development is therefore not within

5    the "scope of the action" considered by the BE. FEMA's conclusion is not supported by the very

6    evidence it relies upon, and is contradicted by overwhelming evidence, including statements of

7    Congressional intent, published judicial opinions, and sister agency determinations. Further, because the

8    ESA defines the "action" to include both direct and indirect effect, it was arbitrary and capricious for

9    FEMA to exclude floodplain development from the action.

10        A.   **FEMA'S Discretionary Floodplain Management Activities May Affect ESA Species and
             Critical Habitat.**

11

12        FEMA's statutory and regulatory authority permit the agency to influence, and even proscribe,

13   development of floodplains. *See e.g.*, *Florida Key Deer*, *supra*, 522 F.3d at 1144 ("FEMA has the

14   authority in its administration of the NFIP . . . to prevent the indirect effects of its issuance of flood

15   insurance by, for example, tailoring the eligibility criteria that it develops"). FEMA retains the authority

16   to establish minimum land use standards, which States and local governments must adopt to participate

17   in the NFIP. 42 U.S.C. § 4022 (providing flood insurance in exchange for adopting land use controls).

18   Congress fully intended for the NFIP to restrict risky floodplain development, and FEMA's minimum

19   land use criteria must fulfill that intent. Congress declared a central purpose of the NFIP was to (1)

20   encourage State and local governments to make appropriate land use adjustments to constrict the

21   development of land which is exposed to flood damage and (2) to guide the development of proposed

22   future construction away from locations threatened by flood hazards. 42 U.S.C. § 4001(e). Congress

23   held flood damages were increasing nationwide due to accelerated floodplain development and "the

24   purpose of [the NFIP] is therefore to require States or local communities, as a condition of future

25   Federal financial assistance to participate in the flood insurance program and to adopt adequate flood

26   plain ordinances with effective enforcement provisions…to reduce or avoid future flood losses." 42

27   U.S.C. § 4002(a)(1). To achieve these goals, Congress authorized FEMA to develop land use criteria

28   designed to:

1    • constrict the development of land which is exposed to flood damage where appropriate;

2    • guide the development of proposed construction away from locations which are threatened by

3    flood hazards;

4    • assist in reducing damage caused by floods; and

5    • otherwise improve the long-range land management and use of flood-prone areas.

6    42 U.S.C. § 4102(c). FEMA also prohibits certain types of development under its regulations, for

7    example, any development in a regulated floodway that potentially could elevate flood levels in a NFIP

8    participating community during the occurrence of the 100-year flood. 44 C.F.R. § 60.3(d)(3). And

9    regulations adopted by NFIP participating communities must take precedence over any less restrictive or

10   conflicting local laws, ordinances or codes for floodplain management. 44 C.F.R. § 60.1(b). Thus, there

11   can be no reasonable dispute that FEMA's discretionary floodplain management criteria have at least an

12   "indirect effect" upon how floodplain development affects ESA listed species and habitat, since such

13   effects may take place after FEMA's actions implementing NFIP in a given area or community, but "are

14   still reasonably certain to occur." *See* 50 C.F.R. § 402.02.

15       The BE is arbitrary and capricious in its conclusion to the contrary. The BE admits that FEMA

16   "has some discretion over the minimum floodplain management criteria, which participating

17   communities must adopt into their local ordinances and enforce as a condition of participation in the

18   NFIP." FEMA-BE-0027878. The BE further admits its management criteria have indirect effects to

19   listed species and habitat, asserting that such "[f]loodplain management standards may reduce economic

20   risk through improved building and construction standards," and that its "floodplain management

21   regulation and insurance rates tend to promote sound construction practices and reduce potential flood

22   damage." FEMA-BE-0027878. Given the extensive relationship between floodplain development and

23   the well-being of ESA listed species and habitat within such floodplains, any effect FEMA's regulatory

24   efforts have upon floodplain development "may effect" such species, requiring federal ESA

25   consultation. *See*, *Cal. ex rel. Lockyer*, *supra*, 575 F.3d at 1018-19 ("Any possible effect, whether

26   beneficial, benign, adverse or of an undetermined character, triggers the formal consultation requirement

27   . . ."); *Florida Key Deer*, *supra*, 522 F.3d at 1144; *Nat'l Wildlife Fed'n*, *supra*, 345 F. Supp. 2d at 1163-

28   64 ("specific actions by FEMA in implementing NFIP may cause damage to endangered chinook

1    salmon by encouraging development and fill in floodplains").

2         FEMA concludes, however, that "[w]hile there is strong evidence to suggest that the minimum

3    floodplain criteria act to restrain floodplain development, FEMA has no data or studies to support when

4    and where that floodplain development is being restrained, or whether the floodplain development in

5    question would have otherwise adversely impacted ESA-listed species or designated critical habitat."

6    FEMA-BE-0027879. FEMA's conclusion is arbitrary and capricious. For FEMA to reject its own

7    "strong evidence" that its floodplain management criteria may indirectly affect listed species and habitat,

8    based on the fact that FEMA has "no data" specifying *exactly where* such actual effects have occurred is

9    an arbitrary and capricious failure to "articulate a rational connection between the facts found and the

10   choice made." *See W. Watersheds Project*, *supra*, 632 F.3d at 498.

11        Moreover, FEMA did not "'consider[] the relevant factors" since its own strong evidence

12   supports a conclusion that its floodplain management criteria "may affect" listed species and habitat.

13   *See*, *W. Watersheds Project*, *supra*, 632. F.3d at 496. Instead, FEMA impermissibly raised the "may

14   affect" threshold for consultation to a "will affect" threshold, basing its determination on a lack of data

15   showing exactly where such effects have occurred. By considering whether the action "will affect"

16   rather than "may affect" listed species and habitat, FEMA failed to proceed in the manner required by

17   law. *See*, *NRDC, Inc. v. Pritzker*, *supra* at 1135 ("agency acts contrary to the law when it gives mere lip

18   service or verbal commendation of a standard but then fails to abide the standard in its reasoning and

19   decision.")

20        "'[M]ay affect' is a 'relatively low' threshold for triggering consultation." *Karuk Tribe of Cal. v.

21   United States Forest Serv.*, 681 F.3d 1006, 1027 (9th Cir. 2012). In *Western Watersheds*, for example,

22   the Ninth Circuit stated that "[t]he minimum threshold for an agency action to trigger consultation with

23   FWS is low, and we conclude that the regulatory amendments here—which affect 160 million acres of

24   public land, home to hundreds of special status species—handily meet that threshold. . . . The sheer

25   number of acres affected by the 2006 Regulations and number of special status species who reside on

26   those lands alone suggest that the proposed amendments 'may affect' a listed species or its critical

27   habitat." *W. Watersheds Project*, *supra*, 632 F.3d at 496. Here, in contrast, the action area contains

28   virtually the entire United States, including the "[o]ver 22,000 communities in the United States [that]

1   participate in the NFIP," and, by extension, virtually each and every ESA listed species and habitat in

2   the country. *See* FEMA-BE-0027706. Thus, FEMA's no effect determination here "offered an

3   explanation for its decision that runs counter to the evidence before the agency, [and] is so implausible

4   that it could not be ascribed to a difference in view or the product of agency expertise." *See Southwest*

5   *Ctr. For Biological Diversity*, *supra*, 100 F.3d at 1448.

6        The 11th Circuit has already determined that FEMA's floodplain criteria may affect ESA species

7   and habitat, and require consultation. In *Florida Key Deer*, the court noted:

8

9        FEMA's <u>own</u> regulations implementing the NFIP . . . impos[e] the condition that certain
        communities '[r]equire a setback for all new development from the ocean, lake, bay, riverfront or

10      other body of water, . . . designated by the Administrator according to the flood-related erosion
        hazard and erosion rate, . . . and depending upon the geologic, hydrologic, topographic and

11      climatic characteristics of the community's land,' and explaining that '[t]he buffer may be used
        or . . . wildlife habitat areas' . . . and . . . requiring that communities, in adopting floodplain

12      regulations, consider '[d]iversion of development to areas safe from flooding . . . in light of the
        need to prevent environmentally incompatible flood plain use' . . . .

13   522 F.3d at 1143, quoting 44 C.F.R. § 60.5(b)(2), § 60.22(c)(2). FEMA's BE decision to the contrary

14   should be set aside.

15        FEMA also implements a Community Rating System ("CRS"), a separate, voluntary program to

16   encourage local floodplain management regulation that exceeds the regulatory minimums, and is

17   rewarded with lower insurance rates. *See* 55 Fed. Reg. 28,291 (July 10, 1990). FEMA asserts that "[t]he

18   CRS promotes higher standards for floodplain management and rewards activities that protect the

19   natural and beneficial functions of floodplain." FEMA-BE-0027881. And the 11th Circuit has also

20   found the CRS to trigger ESA consultation duties. *Florida Key Deer*, *supra*, at 1142 ("Congress directed

21   FEMA to design the program and, in its discretion, to reward localities with discounted insurance

22   premiums for the adoption of floodplain management regulations that exceed the minimum criteria . . .

23   [for] the protection of natural and beneficial floodplain functions" cites and quotes omitted); *see also*,

24   *Cal. ex rel. Lockyer*, *supra*, 575 F.3d at 1018-19 ("Any possible effect" including "beneficial . . .

25   triggers the formal consultation requirement . . .").

26        FEMA's no effect determination was arbitrary and capricious, stating: "While there is strong

27   evidence to suggest that the CRS incentivizes communities to undertake actions that benefit ESA species

28   and designated critical habitat, as well as the natural and beneficial floodplain functions that support

such species and habitat, FEMA has no data or studies to support when and where potentially beneficial actions will take place . . . . As such, FEMA can claim no beneficial effects as a result of the implementation of the CRS." FEMA-BE-0027881. Here again, FEMA's own "strong evidence" admits that the CRS "may affect" listed species and habitat. As such, FEMA's determination runs contrary to the evidence it possesses. *See*, *W. Watersheds Project*, *supra* at 496, 498. Moreover, FEMA's decision did not consider the relevant factors, and was contrary to law, by impermissibly raising the low bar of the ESA's "may affect" standard to a higher threshold of "will affect." *See*, *NRDC v. Pritzker*, *supra*, 828 F.3d at 1135 ("agency acts contrary to the law when it gives mere lip service or verbal commendation of a standard but then fails to abide the standard in its reasoning and decision.")

Finally, FEMA seeks to pass off its own ESA duties to participating communities to "document[] that such compliance is occurring." FEMA-BE-0027879. FEMA's proposal to "clarify that pursuant to 44 C.F.R. §60.3(a)(2), a community must require documentation of compliance with the appropriate Federal and state laws, including the ESA, as a condition of issuing floodplain development permits" does not satisfy FEMA's duties to consult under the ESA. FEMA-BE-0027879. As aptly stated by NFMS in direct correspondence with FEMA, "[t]here is no mechanism under the ESA for FEMA to pass off their ESA responsibilities to the communities." Hunt Dec. Exh. G at 5. Accordingly, FEMA's reliance on this proposed regulatory change is not in accordance with law.

**B.  FEMA's Discretionary Flood Hazard Mapping Activities May Affect ESA Species and Habitat.**

FEMA implements the NFIP in part through the development of Flood Insurance Rate Maps ("FIRM"s) that identify flood-prone areas. 42 U.S.C. § 4101. These maps are used an estimated 30 million times annually for enforcing State and community floodplain management regulations and planning requirements, calculating flood insurance premiums, and determining whether property owners are required by law to obtain flood insurance. Hunt Dec. Exh. A at 3. FEMA uses its discretion to map the floodplain and to revise flood maps to account for changing circumstances. 42 U.S.C. § 4101(e)-(f)(1). The act of designating an area within the floodplain or out of the floodplain is an affirmative action which has serious impacts on the health of a floodplain. For example, FEMA's affirmative determination that an area is *not* a floodplain will then signal to third-parties that they are allowed to fill-

1    in or build in that area, and the area will not receive zoning protections required by FEMA's minimum

2    criteria and incentivized by the CRS, which will severely impact the ecosystem if that area is in fact a

3    floodplain. FEMA therefore is carrying out an agency action that may affect listed species and/or their

4    critical habitat, and consultation with an expert agency under Section 7 of the ESA is required.

5        According to the BE, "FEMA has some discretion over most of the flood hazard mapping

6    activities." FEMA-BE-0027884. "FEMA has discretion regarding the level of study performed for the

7    FIRM. The level of study performed is dependent on a number of factors, such as the level of a

8    community involvement, the level of flood risk, funding, and watershed characteristics. Community

9    officials use flood hazard maps to establish zoning, land use, and building standards, including the

10   development of higher regulatory standards than the minimum standards required as a condition of

11   participation in the NFIP." FEMA-BE-0027884. FEMA further asserts that "FEMA flood hazard maps

12   provide a number of benefits that can positively affect ESA-listed species and designated critical habitat

13   as well. . . . FEMA's flood hazard maps provide information that can help guide development away

14   from flood hazard areas." FEMA-BE-0027884. In short, FEMA admits its floodplain mapping may

15   affect ESA species and habitat.

16       Again, however, FEMA arbitrarily concludes that, "[a]lthough FEMA's non-regulatory products

17   and features could be used to guide floodplain development away from flood hazard areas, FEMA has

18   no data or studies to support when and where such actions have taken place or will take place. As such,

19   FEMA can claim no beneficial effects as a result . . . [and] FEMA's non-regulatory products will have

20   "No Effect" on species listed as threatened, endangered, or proposed for listing under the ESA,

21   designated critical habitats, and EFH." FEMA-BE-0027884. FEMA's determination is arbitrary and

22   capricious, as it runs counter to the evidence, is based on no evidence at all, and incorrectly applies the

23   "may affect" standard. *See Karuk*, *supra*, 681 F.3d at 1027; *W. Watersheds Project*, *supra* at 496,

24   498; *NRDC v. Pritzker*, *supra*, 828 F.3d at 1135.

25       Further, once mapped, FEMA also may modify its FIRMs. According to FEMA:
         A Conditional Letter of Map Revision (CLOMR) is FEMA's comment on a proposed project that
26       would, upon construction, affect the hydrologic or hydraulic characteristics of a flooding source
         and thus result in the modification of the existing regulatory floodway, the effective Base Flood
27       Elevations (BFEs), or the Special Flood Hazard Area (SFHA). . . . Once a project has been
         completed, the community must request a revision to the Flood Insurance Rate Map (FIRM) to
28       reflect the project.

1   Hunt Dec. Exh. B at 2. FEMA simply asserts it "does have some discretion over Conditional Letter of

2   Map Changes," but "there are no practical consequences of FEMA's issuance of a CLOMC," and "the

3   effects determination would typically be a 'no effect.'" FEMA-BE-0027887-88. FEMA provides no

4   rationale for this conclusion, which is contrary to the plain facts.

5       The court in *Nat'l Wildlife Fed'n v. FEMA* explained that FEMA's mapping and map revision

6   functions may affect listed species and habitat:

> FEMA's flood insurance maps are used approximately 15 million times each year for developing
> State and community floodplain management regulations, for calculating flood insurance
> premiums, and for determining whether property owners must obtain flood insurance as a
> condition to receiving mortgage loans or other financial assistance. [Citation.] FEMA has
> promulgated regulations governing the development and revision of flood maps. See, e.g., 44
> C.F.R. §§ 65.5, 65.6; 44 C.F.R. pt. 72. These regulations permit the boundaries of SFHAs on a
> flood map to be revised following man-made alterations to the floodplain, such as the placement
> of fill. 44 C.F.R. §§ 72.1, 72.2. Individual property owners who have filled the floodplain can
> petition FEMA to have their property removed from a flood area through a Letter of Map
> Revision based on Fill ("LOMR-F"). [Citation.] Once property is removed from the floodplain it
> is no longer necessary for the property developer to comply with the community's floodplain
> management regulations. [Citation.] By allowing individuals to remove their property from
> regulation by artificially filling it, FEMA is in effect encouraging filling. . . . FEMA itself
> acknowledges that filling in the floodplain is highly likely to have negative effects on habitat of
> listed and endangered species. [Citation.] Thus the mapping regulations promulgated by FEMA
> in implementing NFIP have a direct causal link to the alleged destruction of salmon habitat and
> the Plaintiffs' injury.

16  345 F. Supp. 2d at 1164. FEMA's determination to the contrary is not supported by any evidence,

17  contradicted by its own evidence, so implausible as to be arbitrary and capricious.

18      **C.  The Evidence Clearly Demonstrates that Implementation of the NFIP as a Whole**
        **Influences Floodplain Development, which May Affect ESA Species and Habitat.**

19

20      FEMA's BE assesses the effects of its NFIP components, individually, as discussed above, but

21  declines to assess the NFIP's effects of facilitating and encouraging floodplain development, as a whole.

22  Instead, FEMA argues that "[f]loodplain development is not an action under the NFIP," since "[ESA]

23  Section 7 applies to actions that are authorized, funded, or carried out by a Federal agency," and FEMA

24  argues that "[f]loodplain development is not authorized, funded, or carried out by FEMA . . . ." FEMA-

25  BE-0027659. As demonstrated, above, FEMA's NFIP implementation has at least an indirect effect

26  upon floodplain development, and the ESA requires that the "action" considered include both direct and

27  indirect effects. 50 C.F.R. § 402.02. Therefore, FEMA's decision to exclude floodplain development

28  from the action under consideration in the BE was arbitrary and capricious, and not in accordance with

law.

Moreover, FEMA's BE determination that the NFIP does not have the effect of facilitating or encouraging floodplain development is belied by unambiguous statements of Congressional intent and purpose, numerous court decisions, other federal agency determinations, and by the very studies FEMA itself relies upon in the BE.

Congress established the NFIP to "encourag[e] sound land use by minimizing exposure of property to flood losses." 42 U.S.C. § 4001(c)(1). Congress found the "availability of Federal … insurance… [is] often [a] determining factor in the utilization of land and the location and construction of public and of private industrial, commercial, and residential facilities." 42 U.S.C. § 4002(a)(2). Congress intended the NFIP to influence floodplain development in a manner that would reduce the nation's flood exposure. 42 U.S.C. § 4001(e)(stating a purpose of the NFIP is encourage the constriction of development in floodplain areas and to direct new development away from locations susceptible to flooding). Congressional findings and Congress's predictive judgments are to be accorded substantial deference. *Turner Broadcasting Sys. v. Fed. Communications Commission*, 520 U.S. 180, 195-96 (1997). And the Legislative history of the 1968 NFIA and its 1994 amendments further reinforce this. In a House floor statement adopting the original NFIA, one Representative noted "that with a reliable type of insurance, that our businessmen in the private sector of our industry can secure for their investments in these low-lying areas, the business potential and business development that we can expect as a result of this legislation will be utterly fantastic." Hunt Dec. Ex. C at 70. A similar statement noted that "[f]or orderly development we must have insurance coverage that compares to the interior coverage that we have." *Id.* at 76. The House Committee report for the 1994 amendments is even more pointed: "in continuing to extend flood insurance to structures located in coastal areas subject to rapid erosion, the Program is failing in its goal of encouraging development in relatively safe areas. The result of this policy has been, instead, to provide an incentive to develop in areas where the risk of flooding is extremely high." Hunt Dec. Ex. D at 16. In other words, lawmakers recognized that FEMA's action of making flood insurance available in specific areas results in incentives to develop in those areas.

In turn, the entire body of jurisprudence regarding FEMA's ESA duties for the NFIP has consistently held that the NFIP facilitates floodplain development and thereby may affect protected

species and habitat. *See Florida Key Deer*, *supra*, 522 F.3d at 1143 ("FEMA and the FWS alternatively argue that . . . the issuance of flood insurance is not a legally relevant 'cause' of the development in the Florida Keys that threatens the listed species. We are not persuaded"); *Nat'l Wildlife Fed'n*, *supra*, 345 F.Supp.2d at 1176-77 (considering "the effects of the action as a whole . . . FEMA's implementation of the NFIP 'may affect' the Puget Sound chinook salmon, thus triggering the formal consultation requirement"); *Coal. for Sustainable Delta*, *supra*, 812 F.Supp.2d at 1132 (denying FEMA's MSJ no effect argument, since "the balance of authority suggests that, although FEMA's individual mapping actions are taken in response to the actions of third parties, each such mapping action is an 'affirmative action' that collectively has the potential to encourage third parties to fill and/or build levees in the Delta floodplain").

Unsurprisingly, all known federal agency determinations arrive at the same conclusions as did Congress and the courts, that the NFIP may facilitate and encourage floodplain development and thereby may affect ESA protected species and habitat. For example, NMFS' extensive Biological Opinion for the NFIP in the State of Oregon not only concluded that the NFIP both facilitates floodplain development and establishes the land-use and construction standards pursuant to which such development may occur; but in fact went so far as to determine that implementation of the NFIP actually results in "adverse modification" of critical habitat and may cause "jeopardy" to the survival of listed species. FEMA-BE-0031305; 0031352-0031353. This conclusion affirmed a previous NMFS' Biological Opinion for the NFIP in the State of Washington, where NMFS held that the inducement of floodplain development due to NFIP implementation affects endangered species. FEMA-BE-0031580-81; *see also* FEMA-BE-0030394 (FWS, 2010, Biological Opinion re NFIP in Monroe County, Florida, noting for example a "BO in 2003 concluded that the effect of the NFIP would result in jeopardy on eight of 10 species evaluated").

Finally, any argument that local communities' participation in the NFIP is "voluntary" is of no consequence. Under the "spending clause" of the U.S. Constitution, Congress may require compliance with federal standards in exchange for receipt of federal funds. The U.S. Supreme Court has explicitly held "Congress may attach conditions on the receipt of federal funds … 'to further broad policy objectives by conditioning receipt of federal moneys upon compliance by the recipient with federal

1   statutory and administrative directives.'" *South Dakota v. Dole*, 483 U.S. 203, 206 (1987). Thus, FEMA

2   has the authority to guide and even restrict certain land use practices of communities even voluntarily

3   participating in the NFIP. FEMA does therefore have the authority to act to protect harmful

4   environmental impacts to the nation's floodplains.

5        Indeed, the extent to which participation is, in fact, voluntary, ignores the practical realities that

6   failure to enroll in the NFIP significantly affects property owners in the community's floodplains,

7   including the availability of federal financial assistance. Mortgages from a federally insured or regulated

8   bank and Veterans Administration loans are prohibited if the building used to secure the assistance is in

9   the 100-year floodplain. 42 U.S.C. § 4012a. The NFIA also prohibits other federal agencies such as the

10  Federal Housing Administration and the Small Business Administration from making or guaranteeing a

11  loan secured by a building in a floodplain unless the flood insurance has been purchased. *Id*. Federal

12  flood insurance cannot be purchased for buildings in non-participating communities. *Id*. §§ 4202, 4106.

13  Accordingly, virtually all communities in the United States with floodplains in their boundaries

14  participate in the NFIP. *See* FEMA-BE-0027706. In the face of this evidence, it is arbitrary and

15  capricious, and wholly implausible, for FEMA to conclude that implementation of the NFIP, does not

16  affect floodplain development or the species and habitat it impacts.

17        **D.  FEMA's Own Evidence Fails to Support its Conclusion that the NFIP does not

18             Influence Floodplain Development.**

19        In the face of the overwhelming evidence, above, FEMA's BE relies on sources that are either

20  inconclusive at best, or actually found that the NFIP can induce floodplain development. The BE most

21  heavily relies on the following three reports: (1) American Institutes for Research ("AIR"), 2006; (2)

22  Government Accountability Office ("GAO"), 1983; and (3) Congressional Research Service, 2013. See,

23  FEMA-BE-0027661-62, 0027734-47.

24        FEMA cites AIR, 2006, for the proposition that "the NFIP and flood insurance does little to

25  influence floodplain development." FEMA-BE-0027662. Yet the AIR report itself specifically found

26  that federally-subsidized flood insurance creates an incentive for development in floodplains by

27  reducing barriers to development. FEMA-BE-0023359. While the report acknowledged that the NFIP's

28  influence is "nuanced," the report asserts that the NFIP has "direct and indirect impacts on the amount of

development that occurs in floodplains." *Id*. Further, the AIR report conducted a nationwide survey of property developers, insurers, lenders, realtors, and floodplain administrators, which found:

- Flood insurance was identified among the most important factors affecting decisions to either purchase or develop property in the community;

- More than three-quarters of respondents identified flood insurance as "very important" to determine where they would develop or purchase property in their community;

- Almost eighty percent of respondents stated that they would not finance or develop floodplain property if federal flood insurance were unavailable.

FEMA-BE-0023359. FEMA appears to ignore this compelling evidence altogether, and instead focus in on the AIR report's more narrow analysis of development in "Coastal Barrier Resource Systems." *See* FEMA-BE-0027740, 43. It was arbitrary for FEMA to draw conclusions nationwide from a study of some coastal barrier regions; and FEMA ignores the studies caveats:

> inferences about the NFIP's developmental impact drawn from current information about the status of [Coastal Barrier] properties are problematic. . . . The [Coastal Barriers] may not presently be an appropriate basis for such generalizations for several reasons. First, discussions with USFWS staff indicate that maps of [Coastal Barriers] land and related developments are frequently outdated, sometimes unrevised since the early 1980s, and conclusions about the rate of development on [Coastal Barriers] lands and its causes are often anecdotal. Second, the motivation for purchase and development of property on [Coastal Barriers] land, and the extent to which this is analogous to property development on non-[Coastal Barrier] lands is not well established. These may constitute different marketplaces with different clientele.

FEMA-BE-0023359.Likewise, FEMA draws conclusions from the 1982 GAO that the report does not support. First, the report is nearly 35 years old. FEMA-BE-0022445. The NFIP has expanded substantially since the issuance of this report. At the time of the report's publication, only 1.9 million NFIP policies were in existence. FEMA-BE-0022445. Today, more than 5 million policies have been issued. FEMA-BE-0027890. Further, a decade after the publication of the 1982 GAO report, Congress passed the National Flood Insurance Reform Act of 1994, which prohibited Federally-regulated lenders from making, extending, or renewing any loan on applicable property unless flood insurance is purchased and maintained. 42 U.S.C. § 4012(b)(1)(A). The effect of this requirement must be accounted for in any analysis of the NFIP's influence on floodplain development as such a requirement directly impacts the availability of financing for such development. As stated above, the AIR report found

1    "[a]lmost eighty percent of the respondents . . . stated that they would not finance or develop floodplain

2    property if federal flood insurance were unavailable." FEMA-BE-0023359. The requirements of the

3    1994 Act may be an influencing factor concerning this figure, which were not in place when the 1982

4    study was conducted. The 1982 GAO data is simply not a reliable indicator of the NFIP's current

5    influence on floodplain development throughout the entire U.S.

6         Second, the 1982 GAO report only analyzed development patterns in 6 coastal and barrier island

7    communities. FEMA-BE-0022445. This cannot justify a finding of no effect nationwide. Third, the 1982

8    GAO report acknowledged that the NFIP was a factor in encouraging floodplain development. The

9    report found that while the NFIP was not the "principal factor" in encouraging floodplain development

10   on barrier islands, it was a factor in the sense that it "offers a marginal added incentive to development

11   in coastal and barrier island communities because it offers financial security against the risk of loss."

12   FEMA-BE-0022445.

13        Third, FEMA relies heavily upon a 2013 Congressional Research Service report for the

14   proposition that very few homes actually obtain NFIP insurance, yet the same Congressional Research

15   Service report contains significant discussion which finds NFIP participation rates to be closer to 50

16   percent. FEMA-BE-0023528-29. This figure is based on an extensive 2006 FEMA-commissioned Rand

17   Corporation study, which specifically focused on the NFIP's market penetration rate. Hunt Dec. Ex. R at

18   8. The Rand report, however, found that in coastal areas, participation rates are closer to 63 percent. *Id*.

19   at 19.

20        While the BE does cite a number of additional studies, its selective treatment of <u>Bagstad K.</u>,

21   <u>Stapleton K., and JR D'Agostino</u>. 2007 "*Taxes subsidies and insurance as drivers of United States*

22   *coastal development*," is illustrative. FEMA's BE cites the study for but a single point, that

23   transportation infrastructure is a factor that facilitates floodplain development. FEMA-BE-0027739; *but*

24   *see*, *Defs. of Wildlife v. United States EPA*, 420 F.3d 946, 961-62 (9th Cir. 2005)(rejecting argument

25   "that it is private development, not the EPA's transfer decision, that would cause any impact on listed

26   species . . . . Events can, of course, have more than one cause.") FEMA simply ignores the remaining

27   evidence in the Bagstad report, which states:

28        "Subsidized insurance allows landholders to develop areas that the market alone might otherwise

deem too risky for construction —floodplains coastal zones . . . . It has . . . encouraged risky development while providing a subsidy to coastal and floodplain developers repetitive loss property owners and the private insurance industry." (FEMA-BE-0024141)

"Evidence also suggests that undeveloped flood prone land sells at a discount due to perceived flood risk but undeveloped land sells at a premium creating an incentive for developers to build in flood prone areas in order to maximize Profit." (FEMA-BE-0024142)

"Finally perhaps the largest fault of the NFIP is that its development in environmentally sensitive areas decreasing the likelihood of development at a sustainable scale. The program externalizes the risk associated with building while imposing the added social cost of foregone ecosystem services." (FEMA-BE-0024143)

In sum, FEMA's determination that the whole of the NFIP has "no effect" to ESA protected species and habitat throughout the country due to facilitating and encouraging floodplain development "offered an explanation that runs counter to the evidence before the agency" (*Lands Council*, *supra*, 537 F.3d at 987), "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise" (*see Southwest Ctr. For Biological Diversity*, *supra*, 100 F.3d at 1448), and failed to "articulate[] a rational connection between the facts found and the choice made" (*W. Watersheds Project*, *supra*, 632. F.3d at 496). On these bases, the BE should be set aside.

## VII.   PLAINTIFFS HAVE STANDING TO MAINTAIN THIS ACTION

Plaintiffs here must establish that their members: (1) have suffered an injury in fact that is concrete and particularized, actual or imminent, (2) that their injury is fairly traceable to FEMA's challenged actions, and (3) that their injury will be redressed by the relief they request. *See*, *Friends of the Earth, Inc. v. Laidlaw Environmental Servs. (TOC), Inc*., 528 U.S. 167, 180-81 (2000); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). Plaintiffs' members live, work, recreate in, and otherwise use and enjoy areas throughout Humboldt, Santa Cruz, and Monterey Counties affected by the NFIP. Kalt Decl., ¶¶ 1-2, 4-17, Nichols Decl. ¶¶ 1-21; Beaman Decl. ¶¶ 19-27; Taylor Decl. ¶¶ 1-5. Plaintiffs' members derive recreational, scientific, conservation, aesthetic, and educational benefits from the existence of the threatened and endangered species that inhabit and/or rely on these counties' floodplain habitats. Kalt Decl., ¶¶ 4-6, 8-17;  Nichols Decl. ¶¶ 2-8, 11-13, 15; Beaman Decl., ¶¶ 19-27; Taylor Decl., ¶¶ 1-5.

To have standing to bring their claims that FEMA has violated its procedural ESA § 7 duty to consult with the federal wildlife services, Plaintiffs need only meet an altered standing test: (1)

1    FEMA violated ESA § 7's procedural rules; (2) these rules protect Plaintiffs' concrete interests; and

2    (3) it is reasonably probable that FEMA's failure to engage in ESA § 7 consultation will threaten

3    their concrete interests. *City of Sausalito v. O'Neill,* 386 F.3d 1186, 1197 (9th Cir. 2004); *see Lujan*,

4    504 U.S. at 572, n.7. Plaintiffs' aesthetic, educational, recreational, and spiritual interests in the

5    endangered species present in Humboldt, Santa Cruz, and Monterey counties, in areas near where

6    they live or visit and frequently use constitute concrete interests for purposes of procedural standing.

7    *See, e.g.*, *Laidlaw*, 528 U.S. at 181; *Lujan*, 504 U.S. at 562-63; *Ecological Rights Foundation*, 230

8    F.3d at 1147-51. ESA § 7 consultation is the process set up by Congress to ensure that federal agency

9    actions are proscribed or modified to take into account advice from the Services so as to avoid

10   jeopardizing the survival and recovery of ESA-protected species. In failing to engage in ESA § 7

11   consultation over its implementation of the NFIP in Humboldt, Santa Cruz, and Monterey counties,

12   FEMA has thus failed to engage in procedures that are designed to protect the Plaintiffs' interests in

13   ESA-protected species in these counties. *See Salmon Spawning & Recovery Alliance v. Gutierrez*,

14   545 F.3d 1220, 1226 (9th Cir. 2008) (failure to follow ESA section 7 consultation requirements

15   constitutes procedural injury for standing purposes); s*ee Bennett v. Spear, 520 U.S. 154, 176 (1997)*

16   (ESA § 7 consultation requirements were designed to vindicate the ESA's substantive species

17   protection purposes).

18          Having established a procedural injury, Plaintiffs need only meet relaxed causation and

19   redressability standards. Plaintiffs need not prove that FEMA's failure to engage in ESA § 7

20   consultation is jeopardizing the survival and recovery of ESA-listed species. The causation element is

21   met simply because FEMA's challenged conduct involves failure to follow procedures that are designed

22   to reduce the *risk* of the type of species harm that injures the Plaintiffs, meaning that failure to take those

23   actions necessarily increases risks to the Plaintiffs. *Natural Resources Defense Counsel v. EPA*, 542

24   F.3d 1235, 1249 (9th Cir. 2008). The redressability prong is met simply because the ESA § 7

25   consultation sought by Plaintiffs is the type of administrative action Congress directed agencies to make

26   to address the type of harm to species that injures Plaintiffs; Plaintiffs need not show that ESA § 7

27   consultation will reduce harm to the ESA-protected species that Plaintiffs have an interest in protecting.

28   *Cantrell v. City of Long Beach*, 241 F.3d 674, 680-82 (9th Cir. 2001); *see also Pacific Northwest*

1  *Generating Cooperative v. Brown*, 38 F.3d 1058, 1065 (9th Cir. 1994) (*Lujan* footnote 7 standing

2  recognizes that "[a] procedural right is created, not because it necessarily yields particular outcomes, but

3  because it structures incentives and creates pressures that Congress has deemed important to effective

4  regulation.").

5       ERF and Humboldt Baykeeper have standing to bring suit on behalf of their members. One, as

6  discussed in the above, their members would have standing to sue in their own right. Two, the interests

7  at stake here are germane to their organizational purposes. Both organizations are environmental public

8  interest groups established for the purpose of advancing their members' interests in environmental

9  protection, including protecting endangered species. Three, neither the claims nor the relief requested

10  require the participation of individual members; Plaintiffs are not seeking money damages or

11  individualized relief. *See Laidlaw*, 528 U.S. at 181; *see also Biodiversity Legal Fndn. v. Badgley*, 309

12  F.3d 1166, 1171-72 (9th Cir. 2002).

13  **VIII.   REMEDIES**

14       Plaintiffs request declaratory relief that FEMA's BE "no effect" determination was arbitrary,

15  capricious, and not in accordance with law; and declaratory relief that FEMA's NFIP implementation

16  "may affect" ESA protected species and habitat. Plaintiffs request the BE be vacated and set aside. *See* 5

17  U.S.C. § 706(2)(A)("The reviewing court shall . . . set aside agency actions, findings, and conclusions

18  found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law");

19  *Klamath-Siskiyou Wildlands Ctr. V. Nat'l Oceanic & Atmospheric Admin. Nat'l Marine Fisheries Serv.*,

20  109 F.Supp.3d 1238, 1244-47 (N.D. Cal. 2015). Finally, Plaintiffs seek injunctive relief staying FEMA's

21  ongoing activities taken in furtherance its invalid BE and "no effect" determination, such as any future

22  floodplain management criteria or floodplain map revisions, unless and until consultation with federal

23  wildlife agencies has been completed. *See Washington Toxics Coal. v. EPA,* 413 F.3d 1024, 1034 (9th

24  Cir. 2005)("It is well-settled that a court can enjoin agency action pending completion of section 7(a)(2)

25  requirements."); *Biodiversity Legal Found., supra*, 309 F.3d at 1177 (explaining that "effectuating

26  Congress' clear intent [in passing the ESA] required issuance of an injunction," citing *TVA v. Hill,* 437

27  U.S. 153, 193-95 (1978).) Accordingly, consultation with NFMS and FWS should be ordered.

28

1

## IX.     CONCLUSION

2

Plaintiffs' motion presents no material dispute of facts, and should be granted.

3

Dated:  January 12, 2018

4

5
                                        /s/
                                        Jason Flanders (Bar No. 238007)

6
                                        Aqua Terra Aeris Law Group
                                        828 San Pablo Ave., Ste. 115B

7
                                        Albany, CA 94706
                                        Tel: 916-202-3018

8
                                        *Counsel for Plaintiffs*

9
                                        /s/
                                        Drevet Hunt (Bar No. 240487)

10
                                        Lawyers for Clean Water, Inc.
                                        1004-A O'Reilly Avenue

11
                                        San Francisco, California 94121
                                        Tel: 415-813-6686

12
                                        *Counsel for Plaintiffs*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28