UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| ECOLOGICAL RIGHTS FOUNDATION, et al., | Case No. 17-cv-02788-JD |
|---|---|
| Plaintiffs, | **ORDER RE CROSS-MOTIONS FOR SUMMARY JUDGMENT** |
| v. | Re: Dkt. Nos. 28, 29 |
| FEDERAL EMERGENCY MANAGEMENT AGENCY, | |
| Defendant. | |

Defendant Federal Emergency Management Agency ("FEMA") administers the National Flood Insurance Program ("NFIP"), which provides affordable federal flood insurance to property owners in participating communities. In 2016, FEMA published a biological evaluation to determine whether proposed revisions to NFIP would affect species and habitats protected under the Endangered Species Act, 16 U.S.C. § 1531 et seq. ("ESA"). FEMA declined to consider any ESA effects from construction or other development in floodplain areas, and did not engage in consultations with the Fish and Wildlife Service ("FWS") or the National Marine Fisheries Service ("NMFS").

Plaintiffs Ecological Rights Foundation and Humboldt Baykeeper are conservation organizations that have sued under the ESA's citizen-suit provision to set aside the biological evaluation. 16 U.S.C. § 1540(g); Dkt. No. 1. Plaintiffs contend that FEMA was wrong to ignore floodplain development issues and should have consulted with NMFS and FWS about possible jeopardy to listed species and habitats.

The parties have filed cross-motions for summary judgment. Dkt. Nos. 28, 29. The Court finds them suitable for decision without oral argument. Civ. L.R. 7-1(b). Because the record

1    establishes that FEMA acted arbitrarily and capriciously in excluding floodplain development
2    from the ESA evaluation, plaintiffs' motion is granted and FEMA's motion is denied.

**BACKGROUND**

**I.    THE ENDANGERED SPECIES ACT**

The ESA was enacted to protect and conserve endangered and threatened species and their habitats, and embodies "a conscious decision by Congress to give endangered species priority over the 'primary missions' of federal agencies." *Ctr. for Biological Diversity v. EPA*, 847 F.3d 1075, 1084 (9th Cir. 2017) (quoting *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 185 (1978)). It authorizes the Secretaries of Commerce and the Interior, through their agencies, to list plants and animals for protection, and to designate critical habitats. 16 U.S.C. § 1533. It is undisputed for purposes of these motions that Humboldt, Monterey, and Santa Cruz Counties are home to several listed species and critical habitats in floodplain areas. These species include coastal salmon and steelhead, the northern spotted owl, the marbled murrelet, the California tiger salamander and red-legged frog, Yadon's piperia (a native California orchid), the Humboldt Bay wallflower, and other plants and animals. The habitats comprise some of the most scenic and wild places remaining in California. *See*, *e.g.*, Dkt. No. 30 (Beaman Decl.); Dkt. No. 30-1 (Kalt Decl.).

The ESA imposes a variety of procedural and substantive requirements to ensure that the actions of federal agencies do not harm listed species or critical habitats. *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 652 (2007); *Ctr. for Biological Diversity*, 847 F.3d at 1084; *Souza v. Cal. Dept. of Transp.*, No. 13-cv-4407-JD, 2014 WL 1760346 (N.D. Cal. May 2, 2014). The centerpiece of the ESA is Section 7(a)(2), which provides that each federal agency "shall, in consultation with and with the assistance of the [Services], insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species." 16 U.S.C. § 1536(a)(2). Implementing regulations for Section 7 state that each federal agency must review its actions at the earliest possible time to determine whether they "may affect listed species or critical habitat." 50 C.F.R. § 402.14(a). In sum, these provisions require that a federal agency must consult with the appropriate Service when proposing an action that may affect a listed species or designated

2

habitat. *See Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1027 (9th Cir. 2012) (en banc).

The purpose of the consultations is to "draw on the expertise of 'wildlife agencies to determine whether [an] action is likely to jeopardize a listed species' or its habitat, and 'to identify reasonable and prudent alternatives' to avoid those harmful impacts." *Ctr. for Biological Diversity*, 847 F.3d at 1075 (quoting *Karuk Tribe*, 681 F.3d at 1020). NMFS provides consultation on actions involving marine and anadromous species and habitats, and FWS for all other species and habitats.

The gold standard for tapping the expertise of the Services is a "formal" consultation where the action agency engages the pertinent Service to prepare a biological opinion to determine whether the action is likely to jeopardize a listed species or critical habitat. *Karuk Tribe*, 681 F.3d at 1020. An agency can also hold "informal" consultations with the Services to discuss whether formal consultation is necessary. 50 C.F.R. § 402.13(a). If the agency determines during informal consultation that the action will not adversely affect a listed species or habitat, and the Service concurs, "the consultation process is terminated, and no further action is necessary." *Id.*

Whether formal or informal, consultation need be pursued only if the proposed action "may affect" a listed species or habitat. If an agency determines on its own "that its action will have 'no effect' on a listed species or critical habitat," consultation is not required. *Karuk Tribe*, 681 F.3d at 1027 (quotation omitted); *see also Defenders of Wildlife v. Zinke*, 856 F.3d 1248, 1252 (9th Cir. 2017).

## II. THE NATIONAL FLOOD INSURANCE PROGRAM

In 1968, Congress established NFIP in the National Flood Insurance Act to provide "appropriate protection against the perils of flood losses and encourag[e] sound land use by minimizing exposure of property to flood losses." 42 U.S.C. § 4001(c). In effect, NFIP strikes a deal with state and local governments. The federal government will make affordable flood insurance available to property owners in risky areas if state and local communities adopt land-use and flood-control measures that incorporate federal guidelines for reducing flood risks and damage.

3

Congress tasked FEMA with promulgating the criteria to "guide the development of proposed construction away from locations which are threatened by flood hazards" and "otherwise improve the long-range land management and use of flood-prone areas." 42 U.S.C. § 4102(c). To participate in NFIP, local communities must adopt ordinances and regulations that meet or exceed the criteria. 44 C.F.R. § 59.22. If a community implements more stringent flood management measures, it may be eligible under FEMA's Community Rating System ("CRS") for discounted policy premiums. These "incentives" are meant to provide extra encouragement for "floodplain and erosion management" and the adoption of "more effective measures to protect natural and beneficial floodplain functions," among other goals. 42 U.S.C. § 4022(b). If a participating community goes in the opposite direction and falls out of compliance with the criteria, it may be suspended from access to federal flood insurance. 44 C.F.R. § 59.24.

NFIP has become a well-established federal program. More than 22,000 communities participate in NFIP, and over 5.6 million federal flood insurance policies are in effect, providing over $1.2 trillion in coverage. FEMA-BE-0027676.[1] The purchase of flood insurance is now required as a condition of receiving a loan from a federally regulated bank for property located in the flood-prone areas of participating communities. 42 U.S.C. § 4012a(b)(1).

FEMA's construction and management criteria are quite detailed. Among many other conditions, participating communities must implement measures "designed to reduce or avoid future flood, mudslide (i.e. mudflow) or flood-related erosion damages." 44 C.F.R. § 59.2(b). All new construction in flood-prone areas must be designed and anchored to prevent flotation, collapse, or lateral movement. *Id.* § 60.3(a)(3). The criteria specify the siting and design of sanitary and sewage systems, the minimum elevation of new residential construction, the parameters of foundations and basements, and minimum drainage around structures to evacuate floodwaters. *See generally id.* § 60.3(a)(6), (c)(2)-(c)(6), (c)(11). FEMA also requires participating communities to adopt a "regulatory floodway" designed to prevent surface water

---

[1] At the parties' joint request, the administrative record was filed with the Court in DVD format and is available for review at the Clerk's Office. *See* Dkt. No. 20. For this reason, there are no ECF citations for record documents.

4

from rising "more than one foot at any point" during a flood. *Id.* § 60.3(d)(2). Levees and floodwalls must meet FEMA specifications before being accredited as providing risk reduction. *Id.* § 65.10. In addition, unless exempted by FEMA, participating communities must "[p]rohibit encroachments, including fill, new construction, substantial improvements, and other development within the adopted regulatory floodway unless . . . the proposed encroachment would not result in any increase in flood levels within the community during the occurrence" of major floods. *Id.* § 60.3(d)(3)-(4).

FEMA publishes maps that identify flood areas throughout the United States. 42 U.S.C. § 4101(f). The maps demarcate flood zones, which determine whether flood insurance is required for a mortgage and the specific floodplain management criteria a participating community must adopt. FEMA periodically updates the maps to stay current with environmental changes and other factors. Local governments, land owners, and developers can also petition FEMA for a map change. An owner, for example, who elevates her property above a certain threshold can petition FEMA to remove it from the flood zone on the map, and thereby unburden it of insurance and other requirements. Local governments can ask to "map out" of the zone properties that are located behind a levee certified by FEMA. Developers can petition FEMA before construction to find out whether their structures will be in or out of a flood zone. *See*, *e.g.*, FEMA-BE-0027689; FEMA-BE-0031586-87.

### III. PRIOR LITIGATION AND THE NEW BIOLOGICAL EVALUATION

The parties are not writing on a blank slate. FEMA has long maintained that Section 7(a)(2) does not apply to its administration of NFIP. Environmental organizations have taken the opposite position for equally long, and have sued FEMA in several cases to enforce Section 7's requirements with respect to NFIP. Federal courts in Florida, Washington, and California have ruled in favor of the plaintiffs and against FEMA. *See Coal. for a Sustainable Delta v. FEMA*, 812 F. Supp. 2d 1089 (E.D. Cal. 2011); *Florida Key Deer v. Paulison*, 522 F.3d 1133 (11th Cir. 2008); *Nat'l Wildlife Fed'n (NWF) v. FEMA*, 345 F. Supp. 2d 1151 (W.D. Wash. 2004). Each court accepted or affirmatively held that the plaintiff environmental groups had standing to sue,

NFIP was an agency action subject to Section 7(a)(2), and to the extent FEMA made a "no effect" determination for ESA impacts, it was unsupported and unsustainable.

The prior litigation led to consultations between FEMA and the Services, with results that are germane to this case. The Services have published several biological opinions concluding that NFIP was likely to jeopardize ESA-listed species and habitats. *See*, *e.g.*, FEMA-BE-0031572 (Washington); FEMA-BE-0031810 (Oregon); FEMA-BE-0030553 (Florida); *Florida Key Deer*, 522 F.3d at 1139-40 (Florida). FEMA has also consulted with the Services on NFIP's implementation in Arizona, New Mexico, Florida, Washington, and Oregon, and adopted "reasonable and prudent alternatives" identified by the Services. Dkt. No. 41-1 (Grimm Decl.) ¶¶ 15-31.

While this history would seem to foreclose any more ESA litigation over NFIP, there is a wrinkle here. In prior circumstances, FEMA typically made decisions about potential ESA effects with little or no explanation of its reasoning. *See*, *e.g.*, *NWF*, 345 F. Supp. 2d at 1175. FEMA says it decided on a different approach after the court cases and used proposed revisions to NFIP as an opportunity to publish a biological evaluation in November 2016. Dkt. No. 41 at 2-4; FEMA-BE-0027654 (the "Evaluation"). FEMA expressly prepared the Evaluation to assess the potential effects of NFIP on listed species and designated habitats. FEMA-BE-0027656; *see also* 50 C.F.R. § 402.12(a) (biological evaluation must "determine whether any such species or habitat are likely to be adversely affected by the action and is used in determining whether formal consultation or a conference is necessary.").

In the Evaluation, FEMA defined the proposed action as "the implementation of the NFIP in the United States as modified by recent legislation and proposed program changes to comply with ESA requirements." FEMA-BE-0027701. FEMA identified the "action area" as consisting of the entire United States and over 22,000 communities participating in NFIP. FEMA-BE-0027660 and 0027706; Dkt. No. 41 at 3. Given the "vast geographic extent of the Action Area," FEMA-BE-0027748, it discussed relevant species and habitats in broad categories. It focused on nine general "primary habitats" and the species they hosted: wetlands, fresh waters, marine waters, beaches, barren lands, caves, rangelands, forest lands, and perennial snow or ice. *See* FEMA-BE-

0027748-52. Much of the Evaluation is devoted to describing species and habitats, and discussing the threats they face from predation, disease, and other factors. Human threats from land and water development are frequently identified. *See*, *e.g.*, FEMA-BE-0027779 (hydrologic management efforts); FEMA-BE-0027790 (urban development); FEMA-BE-0027799 (infrastructure development).

The Evaluation concluded that NFIP "will have no effect on species listed as threatened or endangered under the ESA or on the designated critical habitat of such species." FEMA-BE-0027666. This was so despite "strong evidence" of possible beneficial effects on protected species, which FEMA ultimately discounted because it had "no data or studies to support when and where" those benefits might materialize. *See*, *e.g.*, FEMA-BE-0027879; FEMA-BE-0027881.

FEMA made the "no effect" determination without any consideration of possible ESA impacts from floodplain development. FEMA said it excluded floodplain development from the scope of the Evaluation because state and local governments control land use permits for development, and no federal agency action is involved. FEMA-BE-0027659. FEMA also said that NFIP did not directly or indirectly cause or encourage floodplain development. *See* FEMA-BE-0027661. It based this statement largely on studies by the Government Accountability Office ("GAO") and the American Institutes for Research. FEMA-BE-0027662. FEMA made all of these conclusions on a national basis without discussing the specific conditions or possible effects in Humboldt, Monterey, and Santa Cruz Counties, or any other region.

## LEGAL STANDARDS

The ESA allows citizens to sue but does not impose a standard of review for an agency's decisions. 16 U.S.C. § 1540(g)(1)(A). Consequently, the Court's review is governed by Section 706 of the Administrative Procedure Act. *Karuk Tribe*, 681 F.3d at 1017; *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 496 (9th Cir. 2011). Under the deferential standard of the APA, an agency action will be upheld unless it is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Defenders of Wildlife*, 856 F.3d at 1256-57. An agency action is arbitrary and capricious "if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the

7

problem, or offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Defenders of Wildlife*, 856 F.3d at 1257 (quotation omitted); *see also Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The Court's deference extends to less than stellar work by an agency, so long as its analytical path and reasoning can be reasonably discerned. *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 627 (9th Cir. 2014).

Although the Court will not substitute its own judgment for that of the agency, it must "engage in a careful, searching review to ensure that the agency has made a rational analysis and decision on the record before it." *Wild Fish Conservancy v. Salazar*, 628 F.3d 513, 521 (9th Cir. 2010) (quotation omitted). The Court will not "rubber-stamp" agency decisions that are inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute. *Natural Res. Def. Council, Inc. v. Pritzker*, 828 F.3d 1125, 1139 (9th Cir. 2016) (internal quotation omitted). A federal agency's decision to forego ESA consultation must be reversed if it failed to consider an important aspect of the problem or offered an explanation that runs counter to the evidence. *W. Watersheds Project*, 632 F.3d at 496.

Summary judgment is an appropriate procedure for deciding challenges under the APA. *Nw. Motorcycle Ass'n v. USDA*, 18 F.3d 1468, 1471-72 (9th Cir. 1994). Summary judgment may be granted when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Karuk Tribe*, 681 F.3d at 1017; *Brickman v. Fitbit, Inc.*, Case No. 3:15-CV-02077-JD, 2017 WL 6209307, at *2 (N.D. Cal. Dec. 8, 2017) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

Because this is a record review case, the summary judgment motions will be decided upon a review of the administrative record as it existed at the time of the agency's decision. *Karuk Tribe*, 681 F.3d at 1017; *Jewell*, 747 F.3d at 602 (quoting *Camp v. Pitt*, 411 U.S. 138, 142 (1973)). This means that extra-record materials and "post-hoc rationalizations" for or against the agency's decision will not be considered for the merits of the ESA claims. *Jewell*, 747 F.3d at 602-03; *Asarco, Inc. v. EPA*, 616 F.2d 1153, 1158 (9th Cir. 1980). A few courts appear on occasion to

8

have afforded a broader consideration of extra-record materials in ESA disputes, *see*, *e.g.*, *W. Watersheds Project*, 632 F.3d at 497, but the Court finds that the material in the administrative record is sufficient to resolve the cross-motions without resort to external materials. The Court considered plaintiffs' declarations only for standing purposes, which FEMA raises a passing question about, and to a minor extent for undisputed facts about the habitats, but not for the review of FEMA's "no effect" conclusion.

As the Court previously advised the parties, they are bound by the portions of the record that they have cited and argued in these motions. Dkt. No. 20. "It is not the Court's task to scour the record in search of a genuine issue of triable fact." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (internal quotation omitted).

## DISCUSSION

### I. STANDING

FEMA does not seriously contest plaintiffs' standing to sue. It makes a glancing mention of standing in the opening brief for its motion, Dkt. No. 28 at 13, but omits any further discussion of it in the reply brief or in opposition to plaintiffs' motion. Dkt. Nos. 41, 44.

While the Court would be justified in finding that FEMA has effectively abandoned any argument against standing, plaintiffs have provided ample and unrebutted evidence establishing their right to sue. Plaintiffs filed detailed declarations demonstrating that their members live, work, use and enjoy pertinent areas in Humboldt, Monterey, and Santa Cruz Counties, and that they derive recreational, scientific, conservation, aesthetic, and educational benefits from the critical habitats and listed species in those areas. Dkt. No. 29 at 21-23. Plaintiffs also provided undisputed evidence that there are NFIP participating communities in these counties that have adopted FEMA's floodplain management criteria. *See*, *e.g.*, Dkt. No. 30-1 (Kalt Decl.) ¶¶ 20-22. That is enough to establish standing for a violation of the ESA. *Ctr. for Biological Diversity v. Export-Import Bank of the U.S.*, 894 F.3d 1005, 1012-13 (9th Cir. 2018) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 572 n.7 (1992)).

### II. THE "NO EFFECT" DETERMINATION

The main issue in the cross-motions is whether the "no effect" finding in the Evaluation

9

was arbitrary and capricious in light of the failure to consider potential impacts from floodplain development. The record establishes that it was.

To start, FEMA does not dispute that Section 7(a)(2) applies to its administration of NFIP. Section 7(a)(2) covers "any action authorized, funded, or carried out by" a federal agency. 16 U.S.C. § 1536(a)(2). The implementing regulations define "action" to mean "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies in the United States or upon the high seas. Examples include . . . actions directly or indirectly causing modifications to the land, water, or air." 50 C.F.R. § 402.02.

"There is little doubt that Congress intended agency action to have a broad definition." *Karuk Tribe*, 681 F.3d at 1020 (internal quotation omitted); *see also Natural Res. Def. Council v. Houston*, 146 F.3d 1118, 1125 (9th Cir. 1998) (citing *Hill*, 437 U.S. at 173). For Section 7 purposes, agency action is established when the agency affirmatively authorized the underlying activity, and the agency "had some discretion to influence or change the activity for the benefit of a protected species." *Karuk Tribe*, 681 F.3d at 1021; *see also Nat'l Ass'n of Home Builders*, 551 U.S. at 669.

FEMA does not argue with these principles or the court decisions holding that its administration of NFIP is subject to Section 7(a)(2)'s requirements. Dkt. No. 41 at 2-3; *see also Florida Key Deer*, 522 F.3d at 1143-44; *NWF*, 345 F. Supp. 2d at 1171-72. The Evaluation was prepared expressly because FEMA now recognizes its Section 7 obligations. *See* FEMA-BE-0027656. Consequently, the parties agree that FEMA needed to analyze and document ESA compliance for NFIP.

The problem with the Evaluation is that, after committing to Section 7 review, it arbitrarily and capriciously carved out floodplain development from scrutiny. Nothing in the Evaluation or the administrative record provides a reasoned or reasonable basis for this decision.

FEMA sought to justify the exclusion by stating it has "no role" in issuing or denying local permits for floodplain development, so no federal action could be present to trigger Section 7. *See* FEMA-BE-0027703. But that reasoning simply turned an intentionally blind eye toward the broad scope of FEMA's floodplain management authority. The Evaluation expressly acknowledged

FEMA's broad and deep role in establishing detailed floodplain management criteria and practices, policing participation in NFIP and access to federal insurance based on community adoption and enforcement of the criteria, adjusting insurance premiums under the CRS in light of compliance, and several other measures that directly affect how floodplains are managed. *See* FEMA-BE-0027678-85. The Evaluation also expressly stated that FEMA enjoys discretion in formulating and implementing floodplain criteria and practices. *See*, *e.g.*, FEMA-BE-0027702, 0027877. Indeed, federal regulatory discretion over floodplain management is one of Congress's express goals in NFIP. *See* 42 U.S.C. § 4102(c).

The Evaluation also recognized the environmental aspects of floodplain management and development. The Evaluation described floodplains as "hydrologically important, environmentally sensitive, and ecologically productive areas." FEMA-BE-0027707. It recognized that they "perform a variety of essential functions" such as "maintain[ing] biodiversity," "provid[ing] breeding and feeding grounds" for fish and wildlife, protecting "habitats for ESA species," and furnishing "aesthetic pleasure" from recreational opportunities. FEMA-BE-0027710-0027711. Insurance premiums may be adjusted under the CRS to "protect natural and beneficial floodplain functions." FEMA-BE-0027681. And FEMA requires "compliance with the ESA as a condition of the community's issuance of a floodplain development permit." Dkt. No. 41 at 5.

FEMA's effort to pigeonhole floodplain development solely as a matter of state and local permits is untenable in light of these factors. The requirement of a permit from a local land use authority for development in a floodplain in no way detracts from or displaces FEMA's discretion over floodplain management. Its denial of any meaningful involvement flies in the face of the record and artificially truncates the scope of its actions for Section 7(a)(2)'s purposes. *See Conner v. Burford*, 848 F.2d 1441, 1453 (9th Cir. 1988) (all phases and ramifications of agency action must be considered under Section 7).

FEMA's fallback position is also not well taken. FEMA suggests that even if federal agency action was involved, Section 7 would still not apply because NFIP "does not cause development to occur" as a direct or indirect effect. FEMA-BE-0027741. Any floodplain

11

development that might occur is driven, in FEMA's view, by factors unrelated to NFIP. *Id.*; *see also* Dkt. No. 41 at 5-6.

This reasoning is again the product of an unduly myopic view that has no support in governing law or the administrative record. Section 7(a)(2) applies to any agency action that "may affect" species and habitats. 50 C.F.R. § 402.14(a). This is a "relatively low threshold" and "'[*a*]*ny possible effect*, whether beneficial, benign, adverse or of undetermined character' triggers the requirement." *Karuk Tribe*, 681 F.3d at 1027 (quoting *Cal. ex. rel. Lockyer v. U.S. Dep't of Agric.*, 575 F.3d 999, 1018 (9th Cir. 2009)) (emphasis in original). Actions that have "any chance of affecting listed species or critical habitat -- even if it is later determined that the actions are 'not likely' to do so -- require at least some consultation under the ESA." *Id.* The agency taking federal action must consider "the direct and indirect effects of [its] action on the species or critical habitat, together with the effects of other activities that are interrelated or interdependent with that action." 50 C.F.R. § 402.02; *see also Sierra Club v. Bureau of Land Mgmt.*, 786 F.3d 1219, 1224 (9th Cir. 2015). Indirect effects include "attenuated consequences" of the agency action. *Sierra Club*, 786 F.3d at 1224 (quotation omitted).

The Evaluation was not faithful to these standards when it concluded that NFIP did not cause or encourage floodplain development. The discussion of this complex issue ran all of three pages, and relied on an extremely limited selection of sources. FEMA-BE-0027741-43. FEMA cited data indicating that flood insurance may be underutilized, from which it inferred that factors other than NFIP must be driving any floodplain development that occurs. FEMA-BE-0027741. But even if that broad inference were accepted without reservation, it was far too slender a reed on which to base the sweeping conclusion that NFIP does not encourage development anywhere in the United States, particularly in light of the other portions of the Evaluation that explain FEMA's extensive role in floodplain management. At best, the insurance utilization figures merely beg the question of whether NFIP affects development.

FEMA's reliance on two other studies did not provide any additional evidentiary support. The GAO study it cited was published in 1982 and used data from 1960 to 1980. FEMA-BE-

0027743. How this might be useful or relevant to evaluating floodplain development in 2016, 34 years after publication, was left unsaid.

Other weaknesses further undermined the GAO report. It was based on a review of six "coastal barrier islands" and similar communities that certainly would not adequately represent conditions and development factors in the more than 22,000 communities covered by the Evaluation. FEMA-BE-0022459. The study was done at a time when 1.9 million flood insurance policies were in effect, compared to 5.6 million today, and before the National Flood Insurance Reform Act of 1994 directed lenders in flood-prone zones to require borrowers to purchase flood insurance on their property. The study was based on interviews of only 115 people familiar with the flood insurance program, and even then, 98 of the interviewees "thought that flood insurance aided development." FEMA-BE-0022465. And far from definitively concluding that flood insurance did not cause development, the report found that it offered a "marginal added incentive to development in the coastal and barrier island communities." FEMA-BE-0022467.

The citation to the American Institutes for Research study published in 2006 was equally unavailing. This study compared rates of development in areas covered by NFIP to those in areas outside the program, and reached conflicting conclusions. One the one hand, it stated that NFIP "can have varying direct and indirect impacts on the amount of development that occurs in floodplains. Some components of the NFIP have the affect [sic] of discouraging development while other components of the program act to remove barriers to that development." FEMA-BE-0023441. On the other, it said that NFIP did not cause floodplain development because "market forces," rather than flood insurance, are a potent source of development. FEMA-BE-0027662. In addition to suffering from these ambiguities, the report used data collected in or before 1997, 19 years before the Evaluation was published. FEMA-BE-0027743.

FEMA made matters worse by simply ignoring evidence that NFIP was, in fact, likely to jeopardize endangered species and habitats. In April 2016, NMFS determined that NFIP in Oregon would "directly and indirectly affect anadromous species and their designated critical habitat, and that the effects would be predominantly adverse." FEMA-BE-0031958. In 2008, NMFS concluded that NFIP "is likely to jeopardize the continued existence" of several

13

endangered species in the Puget Sound in Washington State. FEMA-BE-0031572. Similarly, FWS had made a jeopardy determination in 2010 for several endangered species in the Florida Keys. FEMA-BE-0030552. All of these biological opinions pre-dated the Evaluation, yet it had nothing substantive to say about them on the way to making the no effect determination. That was a substantial and damaging omission. *See Friends of Santa Clara River v. U.S. Army Corps of Engineers*, 887 F.3d 906, 924 (9th Cir. 2018); *Jewell*, 747 F.3d at 620; *W. Watersheds Project*, 632 F.3d at 497.

FEMA devotes a considerable portion of its summary judgment briefs to attacking the Services' findings and trying to shore up the Evaluation in general, but those post-hoc explanations and rationalizations are a day late and a dollar short in this record review case. *Jewell*, 747 F.3d at 602-03; *Humane Soc'y of U.S. v. Locke*, 626 F.3d 1040, 1049-51 (9th Cir. 2010). Even if they were considered, they would not save the cause for FEMA. One of its criticisms is that the Services wrongly treated floodplain development as an agency action. *See* Dkt. No. 28 at 7-8. That is not a fair point. The Services defined the "proposed action" as the provision of flood insurance, flood mapping, and floodplain management -- much as the Evaluation did -- and evaluated floodplain development as a possible effect of NFIP. *See* FEMA-BE-0031579; FEMA-BE-0031830. That is entirely consistent with Section 7 and its implementing regulations, and something FEMA should have done here, too.

Other aspects of the Evaluation raise serious concerns as well. The use of a single evaluation to cover the entire United States is problematic. FEMA defined a national "action area" for the Evaluation, and determined that the "vast geographic extent" of this area would permit only "a broad approach" to assessing ESA effects. FEMA-BE-0027748. This wide-angle perspective unduly obscured important local variables in listed species and critical habitats, floodplain development practices, and other factors that should have been taken into account. Given the extraordinary diversity of flora and fauna throughout the United States, it is hard to see how a single national biological evaluation could ever hope to be genuinely useful or true to Congress's mandate to protect species and habitats in their local environments.

14

The Evaluation's treatment of NFIP's potential beneficial effects on protected species and habitats was also questionable. As the Evaluation observed at several points, NFIP presents an opportunity to preserve or even enhance floodplain environments to the benefit of their plant and animal life. *See*, *e.g.*, FEMA-BE-0027881 (CRS incentivizes "good floodplain management practices that protect the habitat of ESA species"); FEMA-BE-0027875 (rate of floodplain construction has "if anything, decreased in recent years due to" NFIP). This accords with FEMA's mandate to "encourage adoption of more effective measures that protect natural and beneficial floodplain functions." 42 U.S.C. § 4022(b). FEMA should have taken potential benefits into account because the "any possible effect" test for triggering consultations includes beneficial effects. *Karuk Tribe*, 681 F.3d at 1027.

As a closing observation, the Evaluation did not give appropriate attention to NFIP's effects on how floodplain development actually takes place. NFIP regulations address a wide array of development modalities, from structural elevation and drainage to the construction of levees. Yet the Evaluation dedicated no more than a footnote to these regulations, and presented no meaningful analysis of FEMA's discretion, through the floodplain management criteria, to minimize harm to ESA-listed species and habitats.[2]

**CONCLUSION**

Consequently, the "no effect" determination in the Evaluation was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A). Plaintiffs' motion for summary judgment is granted, and FEMA's motion is denied.

The Evaluation is set aside and the matter is remanded to FEMA for further consideration in a manner consistent with this order. *Alliance for the Wild Rockies v. Savage*, 897 F.3d 1025, 1037 (9th Cir. 2018); *see also Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985). Because FEMA did not make an adequate ESA determination, the administrative record is incomplete with respect to whether NFIP may affect listed species or designated habitats. For that

---

[2] The footnote refers to a "detailed description" of the floodplain management criteria in the Evaluation's appendix, which in fact contains no detail about those requirements or how their modification might affect protected species or habitats. *See* FEMA-BE-0027679; FEMA-BE-0027941.

reason, the Court will not require consultation with the Services at this time, but FEMA would be well advised to consider consultation in light of the biological opinions prepared for regions outside the ones in this case.

The Court declines to take up plaintiffs' cursory and undeveloped request to enjoin NFIP's implementation. Dkt. No. 29 at 23. If plaintiffs believe an injunction is warranted, they may file a motion within 45 days of this order.

**IT IS SO ORDERED.**

Dated: May 15, 2019

JAMES DONATO
United States District Judge